GRIFFIS, J„
for the Court.
¶ 1. Latoya Mapp, individually and as executrix of the last will and testament of the estate of Will Frank Mapp, Jr., Donald Pugh, Sr., and Darryl Mapp (collectively “Appellants”) appeal the chancery court’s decision finding that Virginia Mapp (“Virginia”) was not mentally competent to execute a deed and that the signature of Marilyn Mapp Chambers (“Marilyn”) on the deed was a forgery. Appellants contend that: (1) Virginia possessed the required mental capacity to understand the nature of her actions when she signed the deed, and (2) Marilyn did, in fact, sign and execute the deed. We find no error and affirm the judgment of the chancery court.
FACTS
¶ 2. Virginia lived and maintained a home in Forest, Mississippi. Virginia was an owner and operator of Mapp Funeral Home. In the summer of 2000, Virginia was no longer allowed to drive.
¶ 3. In 2001, she moved to Jackson, Mississippi to live with her daughter, Marilyn. Marilyn testified that she moved her mother because Virginia was no longer able to stay by herself. While Marilyn was at work during the day, Virginia went to an assisted living center.
¶ 4. In July 2001, Virginia was taken to a neurologist, Dr. George Edward Wilkerson, on referral of Dr. John Myers of MEA Medical Clinic for an evaluation of memory loss. Dr. Wilkerson became Virginia’s treating physician.
¶ 5. After the initial evaluation, Dr. Wilkerson diagnosed Virginia with dementia Alzheimer’s type, hypertension, and other etiologies that were not specified in the testimony. Dr. Wilkerson described dementia Alzheimer’s type as a relentlessly progressive irreversible disease where the patient experiences difficulty with cognition or the ability to think, reason, and manage one’s emotions. He testified that on each visit, Virginia showed progression of memory loss, and in January 2002, he recommended that a conservatorship be established for Virginia. He based his recommendation on his evaluations within a reasonable degree of medical probability because Virginia had shown a significant progression of mental infirmity and was in need of protection.
¶ 6. In 2003, Virginia was continuing to decline and showed evidence of psychosis, paranoia, and sleep problems with insomnia. Dr. Wilkerson prescribed Virginia anti-psychotic medication and diagnosed her with sundowning, a condition in which *1099 the individual does fine during the daytime but becomes very agitated and restless during the nighttime. On one occasion, Virginia was admitted to Rankin Medical Center because she could not be controlled at home. Dr. Wilkerson testified that during 2003 Virginia was overtly psychotic, delusional, out of contact with reality, very agitated, and not sleeping. Dr. Wilkerson continued to treat Virginia until 2004.
¶ 7. On April 2, 2003, a quitclaim deed was filed with the chancery clerk of Scott County purporting to convey certain parcels of property located in Scott County, Mississippi, including Mapp Funeral Home, from Virginia and Marilyn to Virginia’s son, Will Frank Mapp, Jr. (“Will”). The deed contained the alleged signatures of Virginia and Marilyn.
¶ 8. During the time that the deed was allegedly signed, Josie Gammage was employed by Mapp Funeral Home as a secretary. She was also authorized as a notary public in the State of Mississippi. Gam-mage signed an affidavit which stated that Marilyn did not appear before her to execute the deed, and she stated in a deposition that Marilyn was not present when Gammage notarized the deed. However, at trial, Gammage testified that she did not remember if Marilyn was present when Gammage notarized the deed. She also testified that she did not recognize the signature, alleged to be Virginia’s, on the deed. Gammage later invoked her Fifth Amendment right against self-incrimination. The chancery court noted that there was no presumption of validity of the deed because Gammage had invoked her Fifth Amendment right.
¶ 9. In 2006, Marilyn set up a guardianship for Virginia. Marilyn testified that until that time Virginia could bathe and feed herself with supervision. Marilyn testified that she was at work on the day the deed was signed, and she did not sign the deed. Marilyn also testified that Gam-mage did notarize documents, but she never notarized a document that she had signed. Marilyn testified that the signature that appeared on the deed did not belong to Virginia.
¶ 10. Frank Hicks testified, by deposition, as a forensic document examiner. Hicks expressed his opinion, to a reasonable degree of probability in the field of forensic document examination, that the signature on the deed was that of Marilyn. However, in his deposition Hicks stated that he did not have enough known signatures to determine the writer’s full range of variation. He went on to testify that he did not have any signatures that were contemporaneous with the date on the questioned document.
¶ 11. Latoya Mapp (“Latoya”) is the daughter of Will. Before Will passed away in 2006, he signed paperwork giving Latoya power of attorney. Latoya utilized the power of attorney and executed a deed to transfer parcels of property, including Mapp Funeral Home, to herself. She subsequently executed a deed to transfer parcels of property, including Mapp Funeral Home, to Donald Pugh. These transactions are not the subject of the appeal. It was agreed by and between the parties that the interest of Pugh will rise and fall with the validity of the April 2, 2003, deed.
¶ 12. Pamela Patrick testified that she worked for Mapp Funeral Home from July 1997 to July 2003. Patrick testified that her duties at the funeral home consisted of cleaning, running errands, and answering the phone. She also testified that Will had detailed conversations with her about the business. There was one occasion that Will asked Patrick to pick up Virginia and bring her to funeral home because Virginia was going to sign over property and her interest in the funeral home. Patrick testified that when she picked Virginia up, *1100 they talked, and Virginia appeared to be perfectly normal and nothing appeared to be wrong.
¶ 13. The chancellor found that Virginia lacked the mental capacity required to execute the deed and that Marilyn did not sign the deed. Therefore, the chancellor held that the deed was of no force and effect and did not transfer any property from Virginia and Marilyn. It is from this judgment that we consider the Appellants’ appeal.
STANDARD OF REVIEW
¶ 14. A chancellor’s findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. Sanderson v. Sanderson, 824 So.2d 623, 625(¶ 8) (Miss.2002). This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Id. at 625-26(¶ 8). Furthermore, we emphasize that “[i]t is not the job of this Court to redetermine questions of fact resolved by the chancellor.” Jackson v. Peoples Bank and Trust Co., 869 So.2d 422, 423(¶ 5) (Miss.Ct.App.2004) (citing Johnson v. Black, 469 So.2d 88, 90 (Miss.1985)).
ANALYSIS

1. Whether the chancellor’s finding that Virginia did not possess the required mental capacity to understand the nature of her actions when she signed the deed was manifestly wrong or clearly erroneous.

¶ 15. The Appellants contend that the chancellor committed manifest error in finding that Virginia did not possess the required mental capacity to understand the nature of her actions when she signed the deed. Additionally, the Appellants contend that Dr. Wilkerson’s testimony did not overcome the burden of clear and convincing evidence to show that Virginia did not possess the required mental capacity to understand the nature of her actions when she signed the deed.
¶ 16. It is presumed that the grantor of a properly executed deed was mentally competent at the time of its execution. McMahan v. Webb, 990 So.2d 825, 827(¶ 8) (Miss.Ct.App.2008) (citing In re Moran, 821 So.2d 903, 906(¶ 11) (Miss.Ct.App.2002)). Generally, in order to set aside a deed, it must be shown by clear and convincing evidence that the grantor lacked the mental capacity at the moment of execution to understand the legal consequences of his or her actions. Id.
¶ 17. In Mississippi, three ways exist to establish the mental incapacity of a person to execute a deed: (1) the grantor suffered from a total lack of capacity to execute the deed (i.e., that the grantor did not understand the legal consequences of his or her actions); (2) the grantor suffered from a general “weakness of intellect” coupled with either (a) inadequate consideration given for the transfer or (b) a confidential relationship between the grantor and grantee; or (3) the grantor suffered from permanent insanity up to and after the date of execution. Smith v. Smith, 574 So.2d 644, 653-54 (Miss.1990).
¶ 18. At the time the deed was signed, Virginia had been diagnosed with Alzheimer’s disease for two years. Expert testimony described Alzheimer’s as a “relentlessly progressive irreversible disease” where the patient experiences difficulty with cognition or the ability to think, reason, and manage one’s emotions. It was noted that Virginia was having increased difficulty with her short-term recall, problems keeping a checkbook, and difficulty keeping up with day-to-day activities. At *1101 one point, she was hallucinating and had to be admitted to the hospital.
¶ 19. Dr. Wilkerson testified that just a month before the deed was purportedly signed, Virginia was continuing to decline, and he placed her on anti-psychotic medications. However, the testimony of Patrick was that one week before the deed was executed Virginia was perfectly normal. The chancellor chose to believe the testimony of Dr. Wilkerson regarding Virginia’s mental incapacity.
¶ 20. We cannot find the chancellor in error for relying on the testimony from an eminently qualified neurologist in making the determination that Virginia did not have the capacity to know and understand her actions when executing the deed. The evidence presented supports the assertion that Virginia lacked the mental capacity to sign or affix her signature to any formal agreement or contract to relinquish her rights to any interest she may have had in the property. Accordingly, this issue has no merit.

2. Whether the chancellor’s finding that Marilyn did not sign the deed was manifestly wrong or clearly erroneous.

¶ 21. The Appellants next contend that the chancellor committed manifest error in finding that Marilyn did not sign the deed.
¶ 22. When a party challenges the validity of a properly-acknowledged deed, that party must overcome several presumptions favoring the legitimacy of the document. Thompson v. Shell W. E & P Inc., 607 So.2d 37, 40(¶ 3) (Miss.1992). The first presumption provides that, where a deed is properly acknowledged, the instrument is presumed to be authentic because the certificate of acknowledgment infers verity and presumptively states the truth. Id. at 40. This presumption can be overcome only by clear and convincing evidence. Jones v. Minton, 244 Miss. 354, 358, 141 So.2d 564, 565 (1962).
¶ 23. In the bench opinion, the chancellor properly analyzed the evidence to conclude that the testimony of Gam-mage was not sufficient to uphold the presumption of authenticity. The chancellor noted that Gammage signed an affidavit that Marilyn was not in her presence when she notarized the deed. The chancellor also noted a deposition by Gammage that reiterated her statement that Marilyn was not present when Gammage notarized the deed. The chancellor stated that an adverse inference could be drawn from Gam-mage exercising her Fifth Amendment rights when she changed her testimony to that of not knowing whether Marilyn was present or not when Gammage notarized the deed; the chancellor found the notarization of the deed to be invalid. We are of the opinion that the chancellor used the correct reasoning and law to determine that the deed was not properly acknowledged and that the authenticity of the deed could not be presumed.
¶ 24. The second presumption holds that where a grantor’s signature is placed on an instrument by the hand of another, the grantor presumptively adopts this signature as his own absent clear and convincing evidence to the contrary. Id. at 358, 141 So.2d at 566. In Continental Oil Co. v. Walker, 238 Miss. 21, 117 So.2d 333 (1960), the supreme court upheld the lower court’s finding of a forged mineral deed. There, the complainants introduced the following evidence at trial: (1) the grantors, who were alive at the time to testify, informed the court that they did not sign the purported instrument; (2) a handwriting expert testified that the signatures on the deed were not the signatures of the grantors; and (3) the grantors established that they were in another state *1102 on the purported date the mineral deed was signed. Id. at 30, 117 So.2d at 335-36. The supreme court found that this evidence was sufficient to uphold the chancellor’s finding that the deed was forged. Id.
¶ 25. Similarly, in the present case, Marilyn has consistently asserted that she did not sign the deed to transfer the property. Marilyn testified at trial that on the date and at the time the deed was supposedly executed in Forest, she was a teacher in the Jackson Public School System and was at work in Jackson, Mississippi. Gammage signed an affidavit stating that Marilyn was not present at the time she notarized the deed. However, Gammage testified that she did not know whether or not Marilyn was present when she notarized the deed and ended up asserting her Fifth Amendment rights. The chancellor determined that Gammage’s testimony was invalid.
¶ 26. The chancellor then considered the deposition of Hicks, who was accepted as an expert in the field of forensic document examination. Hicks’s determination was that the signature of Marilyn was prepared by the same person, but his testimony falls short of a “virtually certain” degree of confidence. The chancellor found that Hicks was essentially questioning his own opinion. The chancellor determined, based on Hicks’s deposition, that Hicks did not form a conclusive opinion on whether the signature on the deed belonged to Marilyn.
¶ 27. The chancellor would not allow Latoya to testify about her knowledge regarding Marilyn’s signature except on a proffer of evidence. Latoya testified that the signature on the deed was that of Marilyn based upon personal knowledge from birthday cards, graduation gifts, and checks that paid for Latoya’s college books. However, the chancellor determined that it would not be reasonable to rely on Latoya’s testimony regarding her Aunt Marilyn’s signature from articles that Latoya received when she was a child and in college.
¶ 28. We are of the opinion that the chancellor correctly determined that there was clear and convincing evidence that Marilyn did not sign the deed. We find that the chancellor did not commit manifest error in finding that Virginia was mentally incompetent and, therefore, unable to understand the legal consequences of her actions. Further, the chancellor’s determination that the signature on the deed did not belong to Marilyn was not clearly erroneous. Accordingly, the judgment of the chancellor is affirmed.
¶ 29. THE JUDGMENT OF THE SCOTT COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.